UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GEBAR BYRD,                           )
                                      )
            Petitioner,               )
                                      )
      vs.                             )        Case No. 4:18CV1760 RHH
                                      )
MICHELE BUCKNER[1],                   )
                                      )
            Respondent.               )

**MEMORANDUM AND ORDER**

This matter is before the Court on Missouri State prisoner Gebar Byrd's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petition is fully briefed and ready for disposition.

On October 14, 2011, a jury in the Circuit Court of the City of St. Louis, Missouri, found Petitioner guilty of one count of murder in the second degree (Count I), one count of involuntary manslaughter (Count II), one count of endangering the welfare of a child in the first degree (Count III), and one count of domestic assault in the second degree (Count IV).   On December 9, 2011, Petitioner was sentenced to consecutive sentences of life imprisonment on Count I, and seven years' imprisonment on each of Counts II through IV.  The Missouri Court of Appeals affirmed the convictions and sentences.   *State v. Byrd*, 389 S.W.3d 702 (Mo. App. 2012).  Petitioner thereafter filed a motion for post-conviction relief pursuant to Missouri Supreme Court Rule 29.15, which was denied after an evidentiary hearing.   The Missouri Court of Appeals

---

1 Petitioner is currently incarcerated at the South Central Correctional Center in Licking, Missouri.   Michele Buckner is the Warden and proper party respondent.   *See* 28 U.S.C. § 2254, Rule 2(a).   Because Petitioner is challenging a future consecutive sentence, Andrew Bailey, the Attorney General of Missouri, is also a proper respondent.   *See* 28 U.S.C. § 2254, Rule 2(b).

– 1 –

affirmed the denial of post-conviction relief.   *Byrd v. State*, 533 S.W.3d 268 (Mo. App. 2017).

Petitioner is currently incarcerated at the South Central Correctional Center in Licking, Missouri.   In the instant petition for writ of habeas corpus, Petitioner raises the following five claims for relief:

(1)     That the trial court erred in denying Petitioner's motion for judgment of acquittal at the close of the State's case;

(2)     That the trial court erred in denying Petitioner's motion to suppress statements and in admitting testimony and evidence regarding his statements to law enforcement;

(3)     That Petitioner received ineffective assistance of counsel, in that trial counsel failed properly to object to an improper statement from the prosecutor during the State's rebuttal closing argument;

(4)     That Petitioner received ineffective assistance of counsel, in that trial counsel failed to present a diminished capacity defense; and

(5)     That the post-conviction motion court erred in setting an evidentiary hearing with only nine days' notice, thereby constructively denying Petitioner the opportunity to have trial counsel testify on his behalf.

The Court will address the claims in turn.

## **DISCUSSION**

### I.     **Ground 1**

As stated above, in Ground 1 of his petition Petitioner asserts the trial court erred in denying Petitioner's motion for judgment of acquittal at the close of the State's case.   (§ 2254 Petition, PP. 13-15).   Specifically, Petitioner asserts "the State failed to prove beyond a reasonable doubt that Byrd committed second degree murder, because even viewing the evidence in a light most favorable to the State, there was insufficient evidence from which a reasonable juror could find Byrd knew or was aware that his conduct would cause or was practically certain to cause the death of Yasmin Rodriguez."   (*Id.*, P. 13).

Petitioner raised this claim on direct appeal from his convictions.   The Missouri Court of

Appeals first summarized the evidence presented at trial as follows:

> Viewed in the light most favorable to the verdict, the evidence at trial revealed the following:  Defendant[2] and his girlfriend, Yasmin Rodriguez, had a son named Gebar Byrd Jr.  On March 23, 2010, Defendant and Yasmin took Gebar Jr., then twenty-three months old, to a park adjacent to the Mississippi River.  Defendant and Yasmin argued, and Yasmin informed Defendant that she was leaving him.  Defendant was angry because he believed Yasmin was planning to take Gebar Jr. to Mexico.  Defendant also felt that Yasmin had "trapped" him by using Gebar Jr. to prevent Defendant from going to Atlanta.

> Yasmin walked toward the river with Gebar Jr.  Defendant pushed Yasmin into the water while she was holding Gebar Jr.  Yasmin did not know how to swim, and she had previously advised Defendant of that fact.  Defendant jumped into the water to assist Gebar Jr.  Defendant was unable to help Gebar Jr. or Yasmin, and he saw them sink into the water.  Defendant left the park and later disposed of a child safety seat that was in his car and photographs of Gebar Jr.

> On March 28, 2010, Yasmin's sister reported to the University City Police Department that Yasmin was missing.  Detective Shannon Eaton and Detective Christopher Nappier of the University City Police Department questioned Defendant that day about the whereabouts of Yasmin and Gebar Jr.  Defendant stated that he did not know where they were.  On April 9, 2010, police recovered Yasmin's body from the Mississippi River after a fisherman discovered it.

> On April 11, 2010, Defendant met a woman named Melissa Brown.  Defendant informed Ms. Brown that his son's birthday was approaching.  Ms. Brown inquired whether Defendant planned to find Gebar Jr. and spend his birthday with him.  Defendant answered that "he did not need to look for his son because he already knew where they were ... and he would not be able to get to them."

> On April 21, 2010, Detectives Scott Sailor and Lon Ray of St. Louis Police Department questioned Defendant about Yasmin's disappearance.  Defendant denied having any knowledge about the matter.

> On May 26, 2010, officers from the University City Police Department arrested Defendant for an offense unrelated to Yasmin and Gebar Jr.  While Defendant was in custody, Detective Eaton asked Defendant if he was willing to discuss Yasmin's disappearance, and Defendant responded that he was.  During the interview, Defendant stated that he knew nothing about the disappearance of Yasmin and Gebar Jr.

> Later that day, Detective Nappier interviewed Defendant.  Defendant

---

2 Petitioner is referred to as "Defendant" by the Missouri Court of Appeals on direct appeal.

stated that he last saw Yasmin and Gebar Jr. at a riverfront park in the City of St. Louis.   Defendant informed Detective Nappier that after he and Yasmin argued at the park, Yasmin entered the water while holding Gebar Jr.   Defendant stated that he tried to save them but was unable to do so because the water was too cold. Defendant showed Detective Nappier, among others, where the incident occurred.

Detectives Nappier and Sailor transported Defendant to the University City Police Department.    There, the detectives interviewed Defendant. Defendant repeated his earlier statement that Yasmin entered the water while holding Gebar Jr.

Detective Sailor escorted Defendant to the St. Louis Police Department, where Detectives Sailor and Ray interviewed Defendant.   Defendant admitted that he pushed Yasmin into the Mississippi River while she was holding Gebar Jr. and that he knew Yasmin did not know how to swim.   When the detectives asked Defendant what his intent was when he pushed Yasmin into the river, Defendant responded that he "wasn't taking [his] medication."   Detective Sailor believed that Defendant "tr[ied] to dodge the question by saying ... he wasn't taking his medication at the time."

The State charged Defendant with two counts of murder in the first degree and one count of endangering the welfare of a child in the first degree in connection with the events of March 23, 2010. The State also charged Defendant with one count of second-degree domestic assault with regard to an incident on April 30, 2009.

*State v. Byrd*, 389 S.W.2d at 705-706.   The court continued to deny Petitioner's claim as follows:

When a criminal defendant challenges the sufficiency of the evidence, this court must determine "whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Primm*, 347 S.W.3d 66, 72 (Mo. banc 2011).   We view the evidence "in the light most favorable to the verdict, considering all favorable inferences and disregarding all contrary inferences." *Id.*   "This inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt." *State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010) (quotation omitted).   "Instead, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotation omitted).

In his first point on appeal, Defendant claims that the trial court erred in denying his motion for judgment of acquittal at the close of the State's evidence because the evidence was insufficient to support his conviction of second-degree murder.   Specifically, Defendant alleges that the State failed to present sufficient

– 4 –

evidence that he was aware that his conduct was practically certain to cause Yasmin's death.   The State counters that the evidence demonstrated that Defendant pushed Yasmin into the Mississippi River while angry at her and that he knew she was unable to swim.

"A person commits the crime of murder in the second degree if he ... [k]nowingly causes the death of another person...."   Mo. Rev. Stat. § 565.021.1(1).   A person acts knowingly "[w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result."   Mo. Rev. Stat. § 562.016.3(2).

"Direct proof of the required mental state is seldom available, and such intent is usually inferred from circumstantial evidence."   *State v. Letica*, 356 S.W.3d 157, 166 (Mo. banc 2011).   "The defendant's mental state may be determined from evidence of the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct."   *State v. McKinney*, 253 S.W.3d 110, 114 (Mo. App. W.D. 2008) (quotation omitted).   "It will be presumed that a person intends the natural and probable consequences of his acts."   *State v. Stiegler*, 129 S.W.3d 1, 4 (Mo. App. S.D. 2003) (quotation omitted).   "A person is presumed to have intended that death follow acts which are likely to produce that result."   *Id.* (quotation omitted).

Here, the State presented evidence that Defendant was aware that his conduct was practically certain to cause Yasmin's death.   Defendant and Yasmin argued, and Yasmin informed Defendant that she was leaving him.   Defendant was angry because he believed Yasmin was planning to take Gebar Jr. to Mexico. Defendant also felt that Yasmin had "trapped" him by using Gebar Jr. to prevent Defendant from going to Atlanta.   Defendant confessed that although he knew Yasmin was unable to swim, he pushed her into the Mississippi River.   A jury may reasonably infer that Defendant knew that death was a natural consequence of pushing Yasmin into the Mississippi River when she could not swim.

Defendant argues that the only evidence of his intent was his statements to police and that those statements were insufficient to establish that he knowingly killed Yasmin.   In support of his argument, Defendant relies on his comment, when police asked about his intent, that he "wasn't taking [his] medication." However, the fact that Defendant blamed a lack of medication instead of stating that he knowingly caused Yasmin's death does not render the evidence supporting his second-degree murder conviction insufficient.   "An intent to kill in the context of second-degree murder may be inferred when, under the circumstances, the prohibited result expected may reasonably follow from a voluntary act, irrespective of any subjective desire on the part of the offender to have accomplished the prohibited result."   *State v. Edwards*, 30 S.W.3d 226, 232 (Mo. App. E.D. 2000).

Moreover, Detective Sailor testified that Defendant "tr[ied] to dodge the question by saying ... he wasn't taking his medication at the time."   "[A] jury ...

may believe or disbelieve all, part, or none of the testimony of any witness." *Stiegler*, 129 S.W.3d at 3 (quotation omitted).   The jury was entitled to believe Detective Sailor's testimony that Defendant did not truthfully answer questions about his intent.   Point denied.

*Id.* at 709-710 (footnote omitted).

With respect to federal court review of state court conclusions, 28 U.S.C. § 2254 states in pertinent part as follows:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Upon consideration, this Court holds the Missouri State Court's ruling was neither contrary to federal law nor an unreasonable determination of the facts in light of the evidence presented.   The United States Supreme Court has held that in reviewing whether the evidence presented in state court was sufficient to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original) (citation omitted).   *See also Miller v. Lock*, 108 F.3d 868, 870 (8th Cir. 1997).   This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."   *Jackson*, 443 U.S. at 319.   *See also Whitehead v. Dormire*, 340 F.3d 532, 536 (8th Cir. 2003)

– 6 –

(internal quotation marks and citations omitted) ("We must presume that the trier of fact resolved all conflicting inferences in the record in favor of the state, and we must defer to that resolution."); *Weston v. Dormire*, 272 F.3d 1109, 1111 (8th Cir. 2001) (citations omitted) ("In determining the sufficiency of the evidence in habeas cases under 28 U.S.C. § 2254, we view the evidence in the light most favorable to the prosecution and decide whether any rational jury could have found, beyond a reasonable doubt, all of the elements of the crime.").

Here, the State presented evidence that Petitioner was aware his conduct was practically certain to cause Yasmin's death.   Detective Nappier testified Petitioner stated during questioning that he and Yasmin had argued on the date in question.  (Resp. Exh. A, P. 308). Yasmin's sister testified that Yasmin did not know how to swim, and Detective Sailor testified that Petitioner confessed to pushing her into the Mississippi River.  (*Id.*, PP. 235, 354).  Taken together, this evidence was sufficient to permit a reasonable jury to find the elements of the crime of murder in the second degree established beyond a reasonable doubt.  In other words, the jury could reasonably infer Petitioner knew that death was a natural consequence of pushing Yasmin into the Mississippi River when she could not swim.  The decision of the Missouri court thus is entitled to deference, and Ground 1 is denied.

## II. <u>Ground 2</u>

As stated above, in Ground 2 of his petition Petitioner asserts that the trial court erred in denying Petitioner's motion to suppress statements and in admitting testimony and evidence regarding his statements to law enforcement.  (§ 2254 Petition, PP. 15-21).  Petitioner raised this claim on direct appeal.  After describing the circumstances surrounding Petitioner making statements to law enforcement (as delineated above), the court continued as follows:

> Prior to trial, Defendant filed a motion to suppress statements of Defendant that the State intended to admit in evidence.  As grounds, Defendant alleged that the police did not advise him of his constitutional rights prior to

interrogation and he did not waive his right to remain silent, to counsel, or to have counsel appointed for him.   Defendant also asserted that the police did not cease interrogation after Defendant invoked his right to remain silent and to counsel.

The trial court held a hearing on the motion.   Detective Eaton testified that prior to questioning Defendant on May 26, he advised Defendant of his Miranda rights.   Defendant stated that he wished to waive his rights and signed a form entitled "University City Miranda Rules" confirming his waiver.   Detective Nappier testified that before he interviewed Defendant later that day, he reminded Defendant of his Miranda rights.   Defendant waived his rights.   Detectives Nappier and Sailor testified that they subsequently interviewed Defendant.   After approximately one hour, Defendant informed them that he no longer wanted to speak with them and that he "wanted a lawyer."   The detectives ended the interview.

Detective Sailor testified that after he transported Defendant to the St. Louis Police Department later that day, Defendant advised Detective Sailor that he was "ready to tell [him] everything about what happened" to Yasmin and Gebar Jr.   Detective Sailor reminded Defendant that he had requested an attorney.   Defendant stated that he did not need an attorney, he was ready to tell the detective "everything that happened," and he was "tired and…wanted to get it over with."   Detective Sailor asked Defendant if he was sure, and Defendant stated that he was sure.   Detective Ray testified that he heard the foregoing conversation between Defendant and Detective Sailor.

The State introduced a video recording of the interview that followed Defendant's statement to Detective Sailor that he was "ready to tell [him] everything."   At the beginning of the interview, Detective Sailor advised Defendant that he had the right to remain silent, to counsel, and to appointed counsel.   Defendant stated that he understood his rights.   Detective Sailor asked Defendant, "Having understood those rights, are you willing to talk to me about this incident?"   Defendant responded "Yes."   Detective Sailor testified that Defendant had advised him in April that he was "on Haldol" and that he had been "institutionalized."

The trial court found that Defendant made a knowing, intelligent, and voluntary waiver of his constitutional rights.   The trial court denied Defendant's motion to suppress his statements….

The State also called Detectives Eaton, Nappier, and Sailor to testify [at trial].   The State played video recordings of the May 26, 2010 interviews of Defendant by Detectives Nappier and Sailor at the University City Police Department and by Detectives Sailor and Ray at the St. Louis Police Department. Defendant renewed his motion to suppress his statements and objected to the State's introduction of his statements through the recorded interviews and the testimony of Detectives Eaton, Nappier, and Sailor.   The trial court denied the motion and overruled the objections.

*State v. Byrd*, 389 S.W.3d at 706-707.   The Missouri Court of Appeals then denied Petitioner's

claim as follows:

> In his second point on appeal, Defendant argues that the trial court erred in denying his motion to suppress statements.   More specifically, Defendant maintains that the police questioned him after he invoked his right to counsel without guaranteeing that his new waiver of rights was unequivocal and that the police knew that Defendant's mental capacity to waive his rights was "questionable" due to his use of anti-psychotic drugs.   The State responds that Defendant initiated communication with the police after invoking his right to counsel and that no evidence supports his claim that he was mentally incompetent to waive his rights.

> Appellate review of a trial court's decision on a motion to suppress evidence "is limited to a determination of whether substantial evidence exists to support the trial court's ruling," and we will reverse the ruling only if it is clearly erroneous.   State v. Carollo, 172 S.W.3d 872, 873 (Mo. App. S.D. 2005).   We "consider[] the record made at the suppression hearing as well as the trial testimony" and review all facts and reasonable inferences therefrom in the light most favorable to the trial court's decision.   Id.   This court defers "to the trial court's superior opportunity to determine the credibility of witnesses."   State v. Rousan, 961 S.W.2d 831, 845 (Mo. banc 1998).

> "The Fifth Amendment's prohibition against self incrimination provides an accused the right to counsel during custodial interrogation."   State v. Nicklasson, 967 S.W.2d 596, 606 (Mo. banc 1998) (citing Miranda v. Arizona, 384 U.S. 436, 478 (1966).   "Once an accused requests counsel, questioning must cease until counsel has been made available, unless the accused initiates further communication with police."   Id. (citing Edwards v. Arizona, 451 U.S. 477, 485-86 (1981)).   "[T]he State ha[s] the burden to show [the defendant] initiated further discussions with the police and voluntarily, knowingly, and intelligently waived the right he had invoked."   State v. Cook, 67 S.W.3d 718, 721 (Mo. App. S.D. 2002).

> Defendant spoke with several detectives on May 26 and, at one point, invoked his right to remain silent and to counsel.   Prior to the first interview, Detective Eaton advised Defendant of his Miranda rights.   Defendant stated that he wished to waive his rights and signed a written document confirming his waiver.   When Detective Nappier interviewed Defendant later that day, he reminded Defendant of his Miranda rights.   Defendant again waived his rights. Detectives Sailor and Nappier spoke with Defendant in a third interview on May 26.   After approximately one hour, Defendant informed them that he no longer wanted to speak with them and that he "wanted a lawyer."   The detectives ended the interview.

However, Defendant subsequently initiated further discussions with Detective Sailor.  Detective Sailor testified that when he and Defendant arrived at the St. Louis Police Department, Defendant advised Detective Sailor that he was "ready to tell [him] everything about what happened" to Yasmin and Gebar Jr.  Detective Sailor reminded Defendant that he had requested an attorney.  Defendant stated that he did not need an attorney, he was ready to tell the detective "everything that happened," and he was "tired and…wanted to get it over with."  Detective Sailor asked Defendant if he was sure, and Defendant stated that he was sure.  Detective Ray testified that he heard the foregoing conversation between Defendant and Detective Sailor.

The video recording of the interview that followed demonstrates that before asking Defendant any further questions, Detective Sailor reminded Defendant that he had the right to remain silent, to counsel, and to appointed counsel.  Defendant stated that he understood his rights.  Detective Sailor asked Defendant, "Having understood those rights, are you willing to talk to me about this incident?"  Defendant responded, "Yes."  At no time during the recorded interview did Defendant request counsel or ask to discontinue the questioning.  The detectives' testimony and the video recording constitute substantial evidence supporting the trial court's denial of Defendant's motion to suppress his statements.

Defendant argues that the police failed to guarantee that the new waiver of his rights was unequivocal.  In support of this argument, Defendant contends that the detectives did not require him to sign another document confirming his waiver.  However, a defendant's oral statement that he would like to inform police what happened is sufficient to constitute a voluntary waiver of his previously-invoked rights.  See, e.g., Cook, 67 S.W.3d at 722 (after invoking his right to counsel, the defendant advised police that he "would like to tell his side of the story").

Defendant also asserts that the police knew that his mental capacity was "questionable" due to his use of anti-psychotic drugs.  Detective Sailor testified at the suppression hearing that Defendant had advised him that he was "on Haldol" and that he had been "institutionalized."  However, Defendant's motion to suppress contains no mention of Haldol or any other medication.  In addition, no evidence was produced at the suppression hearing or at trial regarding the effects of Haldol, whether Defendant was taking Haldol or any other medication at the time of questioning, or whether Defendant was mentally competent to waive his rights.  Thus, no evidence in the record supports Defendant's claim.  Point denied.

*Id.* at 707-709.

As stated above, because this claim was fully adjudicated on the merits in state court proceedings, this Court cannot grant relief unless such adjudication "(1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d).

"A Miranda warning must be administered when a suspect undergoes custodial interrogation, which occurs when an officer's interaction with the suspect is 'likely to elicit an incriminating response.'"   *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Miranda warnings are "not themselves rights protected by the Constitution but [are] instead measures to ensure that the [suspect's] right against compulsory self-incrimination [is] protected."   *Moran v. Burbine*, 475 U.S. 412, 425, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (internal quotation marks and citations omitted).

As noted above, the trial court heard evidence that prior to questioning Petitioner on May 26, 2010, Detective Eaton advised Petitioner of his *Miranda* rights.   Petitioner stated that he wished to waive his rights, and signed a form to that effect.   Petitioner again agreed to waive his rights before being interviewed by Detectives Nappier and Sailor.   When Petitioner informed the two detectives that he no longer wanted to speak with them without a lawyer, they ended the interview, and only resumed questioning Petitioner after he initiated the discussion by stating he was ready to tell the detectives what had happened.   The trial court found that Petitioner made a knowing, intelligent, and voluntary waiver of his constitutional rights, and denied his motion to suppress statements.

At the outset of trial, Petitioner's counsel renewed his motion to suppress.   (Resp. Exh. A, PP. 215-216).   He again renewed the motion prior to Detective Sailor testifying, and the Court maintained its denial as follows:

The Court ruled that the defendant had waived his right to counsel and that his statements and his waiver were voluntary.  The Court finds that the defendant did invoke his right to counsel during the University City interview and that police properly stopped interrogating him.

They then transferred him to the City Police Department where the City interview took place.  The Court finds that without coercion, without intimidation, without any improper conduct by police, defendant initiated further communication with police.  Then he re-engaged police to again waive counsel and make an additional statement.  The Court will clarify that the defendant a second time voluntarily waived both his right to counsel and made a full and voluntary statement….Objection will be denied.

(*Id.* at 337-338).

The Missouri Court of Appeals affirmed the ruling, finding substantial evidence supported the trial court's denial of Petitioner's motion to suppress his statements.  The court held Petitioner's oral statement that he would like to inform police what happened was sufficient to constitute a voluntary waiver of his previously-invoked rights.  *See State v. Byrd*, 389 S.W.3d at 708.  With respect to Petitioner's claim regarding his use of anti-psychotic drugs, the court noted Petitioner's motion to suppress contained no mention of Haldol or any other medication, nor was any evidence presented at the suppression hearing or trial "regarding the effects of Haldol, whether Defendant was taking Haldol or any other medication at the time of questioning, or whether Defendant was mentally competent to waive his rights."  *Id.* at 708-709.

A suspect's request for counsel can be waived after being invoked.  "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).  *See also Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (citation omitted) ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates

conversation."); *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (Under *Miranda*, interrogation must cease after an invocation of such rights "unless the accused himself initiates further communication, exchanges, or conversations with the police.").

Here, while Petitioner admittedly invoked his rights to remain silent and to counsel, he then waived those rights by initiating further discussion with Detective Sailor. Petitioner proceeded to make multiple statements, without expressing any further desire to discontinue the questioning or invoke his right to counsel. Under these circumstances, this Court finds the Missouri Court of Appeals reasonably determined that Petitioner knowingly and voluntarily waived his rights by initiating further conversation. *See Prentiss v. Ault*, 352 Fed. App'x 141, 142 (8th Cir. 2009) (per curiam) (To be valid, a waiver of rights under *Miranda* must be voluntary, knowing, and intelligent.); *North Carolina v. Butler*, 441 U.S. 369, 375-76, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (holding *Miranda* rights can be impliedly waived). The finding is entitled to deference, as the Missouri Court of Appeals correctly applied the holdings of *Miranda* and its progeny, and further reached factual determinations that were not unreasonable in light of the evidence presented. Ground 2 of Petitioner's § 2254 petition must therefore be denied.

## III.   <u>Ground 3</u>

In Ground 3 of his petition Petitioner asserts he received ineffective assistance of counsel, in that trial counsel failed properly to object to an improper statement from the prosecutor during the State's rebuttal closing argument. (§ 2254 Petition, PP. 21-23). Specifically, Petitioner complains that during her rebuttal closing argument, the prosecutor asked jurors to imagine what it was like for the murder victim in the last moments of her life. Petitioner raised this claim before the 29.15 post-conviction motion court, and the court denied the claim as follows:

<u>FINDINGS OF FACT</u>

– 13 –

12.     Mr. Morris[3] was the only witness to appear and testify at the evidentiary hearing.  Mr. Morris said he had not been made aware of the post-conviction relief proceeding until the morning of the hearing.

13.     Mr. Morris said he was involved in the defense from the very beginning and he had been present at all court proceedings.  He and Mr. Kessler worked together on the case….

19.     Mr. Morris was asked why he did not object to statements by the prosecuting attorney during closing argument that movant[4] characterizes as "personalizing."   Mr. Morris said he did not believe the statements were improper, in that the prosecutor did not ask the jurors to put themselves in the position of the victims.

## CONCLUSIONS OF LAW

3.     Movant claims counsel was ineffective for failing to object when the prosecuting attorney asked the jury to imagine what it was like for Yasmin Rodriguez in the last moments of her life.   Movant claims the statement constituted improper personalization.

It is generally improper for a prosecutor to personalize his closing argument, which occurs where the prosecutor suggests personal danger to the jurors or their families if the defendant were to be acquitted, Jones v. State, 389 S.W.3d 253, 257 (Mo.App.E.D. 2012); State v. Basile, 942 S.W.2d 342 (Mo.banc 1997); State v. Phillips, 940 S.W.2d 512 (Mo.banc 1997), or when the prosecutor asks the jurors to place themselves in the shoes of the victim.   Hall v. State, 16 S.W.3d 582, 585 (Mo.banc 2000).

Failure to object during closing argument is more likely a function of trial strategy than of error.   State v. Carson, 883 S.W.2d 534, 536 (Mo.App.E.D. 1994); State v. Boyd, 844 S.W.2d 524, 529 (Mo.App. 1992).   Movant must show that an objection would have been meritorious and that the failure to object resulted in a substantial deprivation of the right to a fair trial.   Ruff v. State, 815 S.W.2d 460, 465 (Mo.App. 1991).

The Court finds that this claim is without merit because the statement asked the jurors to imagine what it was like for the victim but did not ask them to imagine themselves being the victim.   In addition, in context the statement was not prejudicial.   Mr. Byrd was charged with first degree murder for the death of Ms. Rodriguez, but the jury found him guilty of the lesser charge of second degree murder.

---

3 Attorneys Raphael Morris, Brad Kessler, and Nicholas Williams represented Plaintiff during his trial.   (See Resp. Exh. F, P. 2).
4 Petitioner is referred to as "Movant" by the post-conviction motion court.

(Resp. Exh. F, PP. 4, 6, 9-10).   Movant advanced the claim on appeal from the denial of his

29.15 motion, and the Missouri Court of Appeals denied the claim as follows:

> To prove ineffective assistance of counsel, one must demonstrate that counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances, and that movant was thereby prejudiced.  *Worthington v. State*, 166 S.W.3d 566, 573 (Mo. banc 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).   To satisfy the first prong of this test, a movant must "overcome a strong presumption that counsel provided competent representation by showing 'that counsel's representation fell below an objective standard of reasonableness.'"  *Id.* (quoting *Deck v. State*, 68 S.W.3d 418, 425 (Mo. banc 2002)).   To satisfy the second prong, a movant must show that, had counsel not erred, there is a reasonable probability that the result of the proceeding would have been different.  *Id.*   A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*   This Court does not need to address both components of the inquiry if the Movant makes an insufficient showing on one.  *Strickland*, 466 U.S. at 697; *Sidebottom v. State*, 781 S.W.2d 791, 796 (Mo. banc 1989)….

> Movant claims that trial counsel was ineffective for failing to object to an improper personalization during the State's rebuttal closing argument.   Movant refers to the following excerpt of the State's closing argument:

>> Now imagine Yasmin.   Yasmin who doesn't swim.   She's at the river, she thinks she's just there to talk.   The next thing she knows, she's in the water.   And she's just not in the water, she's under the water.   She's struggling.   She can't get up.   She can't breathe.   And just at the moment, when she is overwhelmed by the knowledge that she's going to die, she thinks about her son, who she can't save, and knows that he's facing the exact same fate that she is.

> To establish a claim of ineffective assistance of counsel for failure to object, a movant must show that the failure to object 1) was not a matter of trial strategy and 2) was prejudicial.  *Barton v. State*, 432 S.W.3d 741, 754 (Mo. 2014).   Counsel is not ineffective for failing to make non-meritorious objections. *Id.*

> In general, a prosecutor may not personalize argument to the jury.  *Gibbs v. State*, 359 S.W.3d 529, 536 (Mo. App. E.D. 2012).   This rule serves to avoid inciting passion or fear that might taint the jury's judgment.   *Id.*   Missouri courts have routinely held that improper personalization results when the prosecutor asks the jurors to place themselves or some other identifiable person in the shoes of the victim or at the crime scene.   *Hall v. State*, 16 S.W.3d 582, 585 (Mo. banc 2000).   Another oft-cited rule regarding improper personalization in Missouri is that an

argument is personalized only when it suggests a personal danger to the jury or their families.  *State v. Rhodes*, 988 S.W.2d 521, 528 (Mo. banc 1999).

The State claims that an objection to the prosecutor's closing argument would have been non-meritorious because the prosecutor "referenced the experience of the Victim in the third person and did not ask the jurors to place themselves in her position."  Here, the State appears to fine-tune a distinction without a difference.  "Imagine" is the operative word here.  An invitation to "imagine" a victim's last moments is, in our view, a shorthand way of personalizing the argument.

Nevertheless, we need not rule on the propriety of the prosecutor's statement because Movant fails to show prejudice resulting from trial counsel's failure to object.  Where there is overwhelming evidence of guilt, such that it cannot be reasonably said that, but for the challenged actions of trial counsel, the jury would have found the movant not guilty, the movant suffers no prejudice. *McCoy v. State*, 431 S.W.3d 517, 522 (Mo. App. E.D. 2014).  Here, the jury heard evidence of Movant's statements in which he confessed to pushing Yasmin into the Mississippi River and watching as she drowned.  In addition to Movant's confession, the State produced evidence that Movant had previously been arrested for assaulting Yasmin Rodriguez, that he had disposed of Yasmin and Gebar Jr.'s belongings, and that he told a witness that he knew where Yasmin and Gebar Jr. were but would not be able to get to them or see them.  Given this overwhelming evidence of guilt, Movant fails to prove that the jury would have found him not guilty had his trial counsel objected to the prosecutor's rebuttal closing argument.  Therefore, trial counsel's failure to object was not prejudicial.  Accordingly, Point I is denied.

(Resp. Exh. J, PP. 4, 5-6).

Under federal law, in order to prevail on his ineffective assistance of counsel claim, Petitioner must show that his attorney's performance was "deficient," and that the deficient performance was "prejudicial."  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  To overcome this presumption, Petitioner must prove that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  *Id.*

Even if Petitioner satisfies the performance component of the analysis, he is not entitled

– 16 –

to relief unless he can prove sufficient prejudice.  *Id.* at 694.  To do so, Petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

Upon consideration the Court finds that with the claim, Petitioner fails to demonstrate the requisite prejudice.  The Eighth Circuit has held that, "[t]o establish ineffective assistance of counsel for failing to object to a prosecutor's closing argument, [a habeas petitioner] must demonstrate, as in every ineffective assistance claim, not only that counsel's performance was deficient, but also that there is a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different."  *Middleton v. Roper*, 455 F.3d 838, 849 (8th Cir. 2006) (internal quotation marks and citation omitted).  Furthermore, the Eighth Circuit has held that a habeas petitioner claiming he was denied due process as a result of the prosecutor's remarks must show the remarks were so egregious that they fatally infected the proceedings and rendered the petitioner's entire trial fundamentally unfair.  *See Culkin v. Purkett*, 45 F.3d 1229, 1235 (8th Cir. 1995).  A petitioner meets this burden only by showing that absent the prosecutor's statement, there is a reasonable probability that the jury would have rendered a different verdict.  *Crespo v. Armontrout*, 818 F.2d 684, 687 (8th Cir. 1987).

Here, the Missouri Court of Appeals found that Petitioner failed to show prejudice resulting from his trial counsel's failure to object.  This Court agrees with the Missouri court that in light of the significant evidence of Petitioner's guilt, including Petitioner's own statements and his previous arrest for assaulting one of the victims, there exists no reasonable probability that but for trial counsel's alleged error the outcome of Petitioner's trial would have been different.   Accordingly, Ground 3 is denied.

## IV.   **Ground 4**

As stated above, in Ground 4 of his petition Petitioner asserts he received ineffective assistance of counsel, in that trial counsel failed to present a diminished capacity defense. (§ 2254 Petition, PP. 23-24). Petitioner raised this claim before the 29.15 post-conviction motion court, and the court denied the claim as follows:

<u>FINDINGS OF FACT</u>

6.      Mr. Kessler advised the Court that a psychiatric examination had been performed. Mr. Kessler said it came back negative as to the murder and child endangerment counts but there was a possible defense for the domestic violence count. Mr. Kessler said the defense had decided, as a matter of trial strategy and not accidentally, not to pursue the defense because juries sometimes think, "if he's crazy we don't want to let him go" and the jury may believe he's getting out right away. Mr. Kessler further stated that "it's not our defense that he had diminished capacity. It's not our defense that he suffered from a mental disease or defect.".…

18.      Mr. Morris said [during the evidentiary hearing] he discussed the possibility of an NGRI[5] defense, but he relied on Mr. Kessler's expertise in the area.…

<u>CONCLUSIONS OF LAW</u>

4.      Movant claims defense counsel was ineffective for failing to present a diminished capacity defense at his trial. Prior to trial the Court ordered a psychiatric evaluation of Mr. Byrd. It is clear from the trial record that the decision not to offer the defense was a reasonable strategic decision. This claim is without merit.

(Resp. Exh. F, PP. 2-3, 6, 10). Movant advanced the claim on appeal from the denial of his 29.15 motion, and the Missouri Court of Appeals denied the claim as follows:

For his third point, Movant contends that trial counsel was ineffective for failing to present a diminished capacity defense at trial. The motion court found that trial counsel was not ineffective because the "decision not to offer the defense [of diminished capacity] was a reasonable strategic decision." In its factual findings, the motion court noted that the trial court ordered a psychiatric evaluation of Movant prior to trial, and cited Kessler's statements at trial in which he explained that he would not be presenting a mental disease or defect defense, along with his reasoning why.

---

5 "NGRI" refers to not guilty by reason of insanity.

On appeal, Movant claims that the motion court erred because "it is not clear from the record that the decision not to offer the defense of diminished capacity was a reasonable decision." Movant cites *State v. Hamilton*, 871 S.W.2d 31 (Mo. App. W.D. 1993) for the proposition that even a strategic decision by counsel can warrant a finding of ineffective assistance if the strategy is not reasonable. *Id.* This case is distinguishable from *Hamilton* in that the record here reflects that Kessler's strategic decision not to pursue a diminished capacity defense was reasonable.

Movant claims that no reasonably competent attorney who knew about Movant's prior psychiatric hospital admission, history of taking (and ceasing to take) an antipsychotic medication, and statements to the police that he might be experiencing a psychotic episode, would have failed to present a diminished capacity defense. In particular, Movant claims that trial counsel was ineffective for failing to raise a diminished capacity defense on Count I, Yasmin's murder, and Count IV, the domestic assault arising from an incident prior to the homicides.

Movant's argument with respect to Count I has no merit. Although Movant clearly had a history of psychiatric troubles, "the existence of a mental disease or defect will not alone suffice to diminish the defendant's criminal responsibility." *State v. Knight*, 355 S.W.3d 556, 559 (Mo. App. S.D. 2011). "Rather, the existence of a mental disease or defect must be linked to the existence of a required culpable mental state." *Id.* Kessler stated on the trial record that "[t]here was a [psychiatric examination] performed in this case. It came back negative as to the two counts of murder and their lesser includeds [sic]" and that the defense did not "have evidence" of mental disease or defect. Trial counsel reasonably investigated possible mental state defenses through the psychiatric examination, but the exam did not indicate a link between Movant's mental disease and his mental state at the time of Yasmin's murder. Therefore, it was certainly reasonable for Kessler not to raise a diminished capacity defense for Count I.

As for Count IV, Kessler stated at trial that the psychiatric examination "did come back as a possible defense on the domestic violence second degree. We have opted not to pursue that. We had noticed up the State of it. We didn't accidentally abandon it." Movant claims that the record does not support the motion court's finding that Kessler's trial strategy was reasonable. Movant takes issue with the motion court's reliance on Kessler's statements at trial and Morris's testimony at the evidentiary hearing, claiming this is "no substitute for trial counsel Kessler's testimony" at the evidentiary hearing. We disagree. After our review of the entire record, including the trial transcript, we are not firmly convinced that the motion court erred in finding that the decision not to pursue a diminished capacity was reasonable trial strategy.

The question in an ineffective assistance claim is whether the decision made was reasonable under all the circumstances, not whether counsel could have

or should have made a different decision.   *Johnson v. State*, 406 S.W.3d 892, 901 (Mo. banc 2013).   "A reasonable strategy, even if it looks imperfect in hindsight, cannot provide the basis for an ineffective assistance of counsel claim." *Worthington*, 166 S.W.3d at 575.   Decisions by counsel not to pursue a diminished capacity defense are often reasonable.   In *Worthington*, defense counsel decided not to pursue a diminished capacity defense where the psychiatrist's report that supported the defense "was outweighed by the negative effect it might have," and defense counsel believed diminished capacity defenses "did not go over well and were difficult to defend." *Id.* at 574-5.   Counsel's decision to not pursue a diminished capacity defense was held to be a reasonably strategic choice, with the Court noting the "extensive experience" of defense counsel. *Id.*   In *Johnson*, a decision not to raise a diminished capacity defense was found to be reasonably strategic when trial counsel was concerned that such a defense would cause the jury to lose focus or become alienated.   406 S.W.3d at 900.

Here, Movant has not overcome the strong presumption that counsel rendered adequate assistance, exercising reasonable professional judgment.   At trial, Kessler stated:

> It has been my long and considered opinion, having done this for almost thirty years, I have yet to see a jury acquit someone on that basis, and it brings in all sorts of things that—as I've spoken to jurors afterwards, their statements are, well, if he's crazy, we certainly don't want to let him go.   Because the way the instruction now reads and has always read in Missouri is it's not guilty by reason of mental disease or defect, which the jury is oftentimes led to believe means they're getting out right away and that they shouldn't do that.   So based on that, we have knowingly and as a result of trial strategy decided not to assert mental disease or defect as to…the domestic violence second degree.

At the evidentiary hearing, Morris testified that the defense's focus was on defending against the murder charges, as opposed to the domestic assault. "Where counsel has investigated possible strategies, courts should rarely second-guess counsel's actual choices.   Trial counsel is normally in the best position to assess the tradeoffs involved in selecting particular defenses." *Middleton v. State*, 103 S.W.3d 726, 736 (Mo. banc 2003).   Trial counsel did investigate the possibility of using a defense based on mental disease or defect with the pre-trial psychiatric examination, and reasonably assessed the merits and disadvantages of such a defense.   Here, like in *Worthington*, an experienced defense attorney determined that a defense based on mental disease or defect might not be well received by the jury.   In addition, the defense was focused on defending the murder charges, and therefore entering a psychiatric report which showed a possible mental defect for the domestic assault but not the homicides could have affected the jury's ruling on the murder charges.   In fact, the jury here found for the lesser included offenses of second-degree murder and involuntary

manslaughter, rather than first-degree murder.   The motion court did not clearly err in finding that counsel was not ineffective.

Movant further claims that "but for trial counsel's failure to present a diminished capacity defense at trial, there is a reasonable probability that the outcome of Mr. Byrd's trial would have been different."   However, because Movant has not shown that counsel's performance fell below an objective standard of reasonableness, we need not address the prejudice prong.   Point III is denied.

(Resp. Exh. J, PP. 8-11).

Upon consideration the Court finds that with this claim, Petitioner fails to demonstrate his counsel's conduct fell outside the wide range of professionally competent assistance.   As noted above, the record indicates trial counsel was aware of a potential diminished capacity defense, and made a deliberate choice not to pursue this strategy.   Counsel stated that a psychological examination was performed in Petitioner's case, and diminished capacity came back as a possible defense only as to the domestic violence charge.[6]   (Resp. Exh. A, P. 399).   Counsel opted not to pursue the defense as to that charge, however, because in his experience jurors are reticent to find defendants not guilty by reason of mental disease or defect for fear the offender will   immediately be released.   (*Id.*, PP. 399-400).[7]   Counsel continued to confirm that Petitioner's defense was not that he suffered from a mental disease or defect.   (*Id.*, P. 401).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]"   *McLaughlin v. Precythe*, 9 F.4th 819, 827 (8th Cir. 2021) (internal quotation marks and citation omitted).   *See also United States v. Unpradit*, 35 F.4th 615, 632 (8th Cir. 2022) (same).   This Court finds that the Missouri court's decision is neither contrary to nor an unreasonable application of clearly established federal law,

---

6 Counsel noted the exam came back negative as to the two counts of murder and their lesser included offenses.   (Resp. Exh. A, P. 399).

7 Counsel stated that during his nearly thirty-year career, he had never seen a jury acquit a defendant on that basis.   (Resp. Exh. A, P. 400).

as Petitioner fails to overcome the strong presumption that trial counsel rendered adequate assistance.   Ground 4 is denied.[8]

## V.   <u>Ground 5</u>

As stated above, in Ground 5 of his petition Petitioner asserts that the post-conviction motion court erred in setting an evidentiary hearing with only nine days' notice, thereby constructively denying Petitioner the opportunity to have trial counsel testify on his behalf.  (§ 2254 Petition, PP. 24-27).  Federal habeas relief is available to a state prisoner only on the ground that he is in custody in violation of a constitutional or federal statutory right. *Williams-Bey v. Trickey*, 894 F.2d 314, 317 (8th Cir.), *cert. denied*, 495 U.S. 936 (1990); 28 U.S.C. § 2254(a).  Claims that do not reach constitutional magnitude cannot be addressed in a petition for habeas corpus.   *Carter v. Armontrout*, 929 F.2d 1294, 1296 (8th Cir. 1991).

"Section 2254 only authorizes federal courts to review the constitutionality of a state criminal conviction, not infirmities in a state post-conviction relief proceeding." *Williams-Bey*, 894 F.2d at 317 (citation omitted).  *See also Williams v. State of Missouri*, 640 F.2d 140, 143-44 (8th Cir.), *cert. denied*, 451 U.S. 990 (1981). Petitioner's claim that the post-conviction motion court improperly set an evidentiary hearing with only nine days' notice is collateral to his conviction and detention, and therefore is not cognizable in this federal habeas petition. *Williams-Bey*, 894 F.2d at 317.   Ground 5 is denied.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (ECF No. 1) is **DENIED**, and his claims are

---

8 In light of the above ruling, the Court need not consider whether Petitioner establishes the requisite prejudice.

**DISMISSED** with prejudice.   A separate Order of Dismissal will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that because Petitioner cannot make a substantial showing of the denial of a constitutional right, the Court will not issue a certificate of appealability.   *See Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997), *cert. denied*, 525 U.S. 834 (1998).

Dated this 27th day of September, 2023.

_____
RODNEY H. HOLMES
UNITED STATES MAGISTRATE JUDGE